IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **ALYSSIA MOULTON, and** | ) | **JURY DEMAND** |
| **A.M., a minor child** | ) | |
| | ) | **Case No.:** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SOUTHERN HEALTH PARTNERS, INC.,** | ) | |
| **MIRANDA TAPP,** | ) | |
| **KAYLA HARVEY,** | ) | |
| **DENISE PURIFOY,** | ) | |
| **J. DOE DEFENDANTS** | ) | |
| **Defendants.** | | |

---

## COMPLAINT

---

## INTRODUCTION

1. This Complaint arises out of an incident in the Montgomery County, Tennessee jail, where Alyssia Moulton, who was pregnant, delivered her newborn baby, A.M.
2. Ms. Moulton was alone in her jail cell when she delivered the baby.
3. She delivered the baby into the toilet.
4. As a result of delivery into the toilet, A.M. suffered various injuries, including a blood infection of Gram-Positive Cocci and an eye infection of Citrobacter freundii.

5. As a result of this incident, Ms. Moulton suffered extreme physical pain and emotional distress.
6. At all relevant times, Ms. Moulton was a pre-trial detainee.

## JURISDICTION AND VENUE

11. This action arises under the United States Constitution and under the laws of the United States of America, particularly under the provisions of the Fourteenth Amendment of the United States Constitution, and particularly under the Civil Rights Act, codified at 42 U.S.C. § 1983 et seq.

12. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) (2) because all the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

7. Plaintiff Alyssia Moulton is a citizen and resident of Kentucky. At all relevant times, she was a pre-trial detainee held in the Montgomery County jail prior to an adjudication of guilt.

8. Plaintiff A.M. is a minor child, born into a toilet in a Montgomery County, Tennessee jail cell. His identity has been made available to counsel for defendants to the extent Plaintiffs' counsel is aware of such defense counsel.

9. Defendant Southern Health Partners, Inc., is a for-profit corporation operating as a quasi-governmental actor pursuant to a contract with Montgomery County, Tennessee.

10. Defendant Miranda Tapp was at all times a health care professional acting in the course and scope of her employment with SHP to provide health care services to inmates in the Montgomery County Jail.

11. Defendant Kayla Harvey was at all times a health care professional acting in the course and scope of her employment with SHP to provide health care services to inmates in the Montgomery County Jail.

12. Defendant Denise Purifoy was at all times a health care professional acting in the course and scope of her employment with SHP to provide health care services to inmates in the Montgomery County Jail.

13. J. Doe Defendants are nurses or other medical staff acting in the course and scope of their employment with SHP to provide health care services to inmates in the Montgomery County Jail. Based on available information, their

identities cannot be ascertained at the time of filing. Further discovery and development of the record is needed to identify these individuals.

## FACTUAL BACKGROUND

14. On August 19, 2023, Alyssia Moulton was booked into the Montgomery County Jail on a Burglary charge (TCA § 39-14-402).

15. Alyssia Moulton was noted to have a positive pregnancy test on 8/19/23 in a form titled "Re: Medical Restrictions."

16. Alyssia Moulton first learned that she was pregnant from this positive pregnancy test.

17. During an evaluation performed by Defendant Miranda Tapp, Alyssia Moulton estimated that her last menstrual period [LMP] was 3/1/23, but she was unsure (SHP 0014).

18. In a 2018 document titled "Pregnancy and Postpartum Care in Correctional Settings," the National Commission on Correctional Health Care ("NCCHC") observed that many incarcerated pregnant women are unsure of their LMP. (**Exhibit A**). The document is "Endorsed by the American College of Obstetricians and Gynecologists (ACOG), March 2018, and should be construed as ACOG clinical guidance."

19. In the document, the NCCHC observed:

> "Ultrasounds are commonly performed in the first trimester to confirm gestational dating. This may have particular relevance among incarcerated women, who are often uncertain about the dates of their LMP. Accurate determination of the gestational age assists with providing appropriate prenatal care, including timely referral for aneuploidy screening, and in case complications of pregnancy arise. A sonographic anatomic survey of the fetus is typically performed between 18 and 20 weeks. Subsequent ultrasounds are performed when specific indications exist."

20. Ms. Moulton did not receive an ultrasound to confirm gestational dating.

21. Prior to her incarceration, Alyssia Moulton had used narcotics as recently as 8/19/23, the same day she was booked into custody at the Montgomery County jail.

22. Ms. Moulton was not scheduled by Miranda Tapp (or by any Defendant, at any point) for an evaluation by a doctor.

23. The failure to schedule Ms. Moulton for a routine pre-natal medical evaluation by a licensed physician was especially egregious given Defendant Tapp's awareness that Ms. Moulton 1) was unaware she was pregnant, 2) had been using opioids while pregnant 3) was unsure of her last menstrual period, 4) even her last menstrual period as reported would make her at least 24 weeks pregnant, and 5) during her entire pregnancy, she had never been evaluated by a medical doctor.

24. Defendant Miranda Tapp did not perform an ultrasound or schedule an ultrasound for Ms. Moulton to confirm gestational dating.

25. Ms. Moulton was housed in medical isolation, where she spent 23 hours per day in her cell, with 1 hour per day out of her cell.

26. This housing condition constituted solitary confinement.

27. Ms. Moulton was housed in solitary confinement for the duration of her incarceration at the Montgomery County jail, from 8/19/23 to 8/27/23 (until delivery of her baby and transport to the hospital) and from 8/29/23 (upon return from the hospital) until her release from jail custody on 9/5/23.

28. It is the official position statement of the National Commission on Correctional Health Care that "pregnant women should be excluded from solitary confinement of any duration." (**Exhibit B**, NCCHC Position Statement: Solitary Confinement, April 2016.)

29. On 8/20/23, Alyssia Moulton was evaluated by Kentiana McClain, who recorded that Ms. Moulton was experiencing "detox symptoms":

> I/m was seen cell-side for initial detox f/u. I/m reports SA hx and recent use of xanax, fentanyl, alcohol, and meth; last use 8/19. I/m reports current detox symptoms of nausea, body aches, restlessness, soreness. I/m denies si/hi and/or avh; reports "poor" sleep and appetite. I/m reports provisional m/h dx of ptsd, depression, insomnia, and adhd. I/m presented uncomfortable during session as she was observed turning and readjusting several times during meeting. Clinician observed no additional concerns at this time; Clinician reviewed m/h sick call protocol at the end of meeting.

(SHP 0109).

30. At no time did any employee of SHP educate Ms. Moulton about the availability of medication to manage her withdrawal symptoms.

31. At no time did any employee of SHP provide Ms. Moulton with appropriate medications to manage her withdrawal symptoms.

32. The failure to educate Ms. Moulton about the risks of withdrawal—especially while pregnant—or to provide her with appropriate medication options to manage her withdrawal symptoms was contrary to the recommendations of ACOG.

33. In a July 2021 ACOG Committee Opinion titled "Reproductive Health Care for Incarcerated Pregnant, Postpartum, and Nonpregnant Individuals," **(Exhibit C)** the Committee on Health Care for Underserved Women wrote:

> "Pregnant individuals with opioid use disorder should not undergo opioid withdrawal and should instead receive medications for opioid use disorder with methadone or buprenorphine and behavioral treatment. Despite medications for opioid use disorder being the recommended treatment in pregnancy, evidence suggests that some jails and prisons force pregnant individuals to undergo withdrawal."

34. Defendants' failure to provide Ms. Moulton with methadone and buprenorphine was contrary to the recommendations of ACOG.

35. Further, in the documented identified above as Exhibit A, the NCCHC explicitly states that:

> "Acute withdrawal from opiates is also risky for the developing fetus and has been shown to be associated with miscarriage and stillbirth, and can interfere with placental function. Screening for drug and alcohol use is a first step and is followed up with referral to treatment. **For women who report opiate use, the standard of care is not to detoxify from opiates during pregnancy due to the fetal risks of withdrawal. Rather, the standard of care is to provide opioid substitution therapy with methadone or buprenorphine for the duration of their pregnancy, in conjunction with prenatal care and appropriate mental health care and psychosocial services."**

36. Defendants' failure to provide Ms. Moulton with opioid substitution therapy with methadone or buprenorphine was contrary to the standard of care.

37. While Defendants initially provided Ms. Moulton with Tylenol, due to an apparent computer error, they discontinued the Tylenol on 8/25/23. (SHP 0058).

38. Ms. Moulton delivered her baby, A.M., on 8/27/23. The last dose of Tylenol she received before delivery was on 8/24/23 at 8:04 p.m. (SHP 0098).

39. Defendants failed to provide Ms. Moulton with any pain medication management during the days leading up to the delivery of her child.

40. Defendants failed to provide Ms. Moulton with any pain medication management on the day of the delivery of her child.

41. Defendants failed to provide Ms. Moulton with any pain medication management during the labor and delivery of her child.

42. In fact, on the date of the delivery (8/27/23), Defendants failed to take Ms. Moulton's vitals. (SHP 0121, SHP 0164).

43. A "Refusal of Medical Treatment and Release of Responsibility" form records that Ms. Moulton "did not present for vitals" during the morning medication pass ("med pass") on 8/27/23. (SHP 0164).

44. The reason that Ms. Moulton did not present for morning med pass was that she was physically unable to walk due to intense discomfort from her labor pains.

45. The refusal of treatment form was never signed by Ms. Moulton.

46. The night before, on 8/26/23, Ms. Moulton had complained "during PM med pass" of "heartburn."

47. In fact, this was likely the beginning of labor pains and discomfort related to the impending birth of her child.

48. In any event, Defendant Denise Purifoy recorded that Ms. Moulton had complained of "heartburn" but provided no actual care to Ms. Moulton, such as evaluating her, performing a check for vital signs, or evaluating whether she had begun labor.

49. Defendant Purifoy simply noted that, in effect, nothing could be done for Ms. Moulton because another provider would need to approve heartburn medication.

50. Despite Defendants' knowledge that 1) Ms. Moulton was pregnant, 2) experiencing withdrawal symptoms, 3) had never been seen by a doctor during her pregnancy, 4) was not on withdrawal medication (as recommended by ACOG), 5) was in fact no longer even on the Tylenol that Defendants had intended for her to receive, 6) had complained of "heartburn" on the evening of 8/26/23, and 7) did not present to the nurse's station for morning med pass—no Defendant bothered to check on Ms. Moulton on the morning of 8/27/23—the day she would ultimately deliver baby A.M. into the toilet of her jail cell.

51. During the day on 8/27/23, Ms. Moulton began to experience contractions. She complained to available staff that she was in pain and experiencing contractions.

52. The timing of these complaints was, according to a statement by the Montgomery County Sheriff's Office, 11:31 a.m.

53. According to the statement (**Exhibit D**):

> "At 11:31 AM, an inmate housed in a medical pod notified a Deputy of a medical concern. The Deputy contacted the medical

> staff, as per protocol, and a Nurse arrived within a few minutes. The Nurse, a Licensed Practical Nurse, conducted an assessment and left the cell to consult with additional medical staff. A Registered Nurse arrived thereafter at 11:54 AM to conduct a follow-up assessment. After the follow-up assessment, the medical staff left the cell but continued to assess the situation and order additional medical tests. Deputies continued to check on the inmate during this time. At 12:41 PM, a Deputy responded to the inmate's cell and discovered that the inmate had given birth while in her cell. The Deputy assisted the inmate while the jail medical staff and Emergency Medical Services, (EMS) were alerted. Medical staff treated the inmate on scene and then EMS transported her, and her baby, to the hospital."

54. Ms. Moulton was seen by "nursing staff" on 8/27/23 according to an entry by Defendant Kayla Harvey. (SHP 0109). That note reads:

> "Pt seen by nursing staff due to report of contractions. Pt assessed by x 2 nurses. She is lying on bunk upon arrival in no signs of distress. Abdomen palpated by nurse for approximately 5 minutes. No palpable contractions noted. Pt stated, "Feel right here, it's starting again". Still, no palpable contraction observed. PT states pain has been intermittent to midline, pelvic region since she woke up this morning. She states she has had one pregnancy x 4 years ago in which she underwent an emergency c-section due to what she describes as a possible abruption. She states infant was just under 38 weeks at that time. She reported on intake her LMP was 03/01/23. When advised of this information, she states, "Well it may have been January, I don't know you should probably just send me to the hospital." Pt's abdomen appears mildly enlarged. She denies any leaking of fluid or bleeding. She reports thick, white discharge off and on for several days without odor. She denies any known exposure to STD's and has been refusing detox medication. FHR 120 at the umbilicus, no deceleration noted upon auscultation with pt's reported onsets of pain. BP 142/78, HR-91, Sats-99% on ra. Pt educated on slow breathing techniques and instructed it is important to remain calm so to oxygenate her baby well as she appears very anxious. When holding conversation with staff, pt does not tense extremities and is able to speak without any difficulty or onset of pain. Provider made aware, verbal order given to inquire if an US can be obtained today in order to evaluate further. Urine being obtained to evaluate possibility of

> UTI. Nurse advised to offer medication to pt again and explain importance of taking these while coming off of substances and pregnant"

55. Neither Defendant Harvey nor the other nurse(s) took Ms. Moulton's complaints of contractions seriously.

56. Defendant Harvey's claim that Ms. Moulton "refus[ed] detox medication" is demonstrably false, as Ms. Moulton *was never offered* detox medication. Worse, what little pain medication Defendants had intended Ms. Moulton to receive (Tylenol), was not provided to her in the days leading up to her labor and delivery, as explained, *supra*.

57. The failure of these Defendants to take Ms. Moulton's complaints seriously contravenes the aforementioned ACOG opinion (Exhibit C), which provides:

> "Custody staff and clinicians must not dismiss symptoms that can signal miscarriage, preterm labor, labor, preeclampsia, or other pregnancy conditions, and pregnant people should be evaluated in a timely fashion by a qualified clinician."

58. Defendant Harvey and the other nurse(s) were both objectively and subjectively aware that Ms. Moulton 1) reported contractions, a serious medical condition, and 2) reported that "you should probably just send me to the hospital."

59. Defendant Harvey and the other nurse(s) consciously disregarded the foreseeable risk that Ms. Moulton would imminently deliver her baby.

60. Defendant Harvey and the other nurse(s) consciously disregarded the foreseeable risk that Ms. Moulton would imminently deliver her baby in a jail cell that was not appropriately equipped for the delivery of a child.

61. As a result of Defendants' conscious disregard of this risk, Ms. Moulton gave birth alone in a jail cell, delivering her baby into the toilet.

62. The jail cell in which Ms. Moulton was forced to deliver her baby alone is not a medically adequate facility.

63. The ACOG opinion provides that "delivery services must occur in a licensed hospital, with arrangements for high-risk pregnancies, when indicated."

64. Ms. Moulton's delivery did not occur in a licensed hospital or other facility of comparable medical capability.[1]

65. Defendant Harvey and the other nurse(s) dismissed the seriousness of Ms. Moulton's complaints of contractions and lackadaisically, with no sense of urgency, and proceeded "to inquire if an US [Ultrasound] can be obtained today in order to evaluate further." This note was entered into the electronic medical records system at 12:28 p.m.

66. According to an unusually long, standalone, late entry (made at "1500", though purportedly relating events occurring at 12:42 p.m.) into Ms. Moulton's

---

[1] *See Havard v. Wayne County*, 436 Fed. Appx. 451, 454-455 (C.A.6, 2011) ("The virtually inevitable result of pregnancy and labor is the birth of a child. The birth of a child always presents a risk of serious injury to both mother and child. Adequate medical care means the appropriate standard of care under the circumstances. In this context, the appropriate standard of care would include birth in a place equipped with the personnel and resources to handle pregnancy-related emergencies . . .")

medical file by Defendant Harvey (SHP 0163), it was at "approximately 1242," a mere 14 minutes after Defendant Harvey entered the above note[2] regarding an ultrasound "today," that Ms. Moulton delivered baby A.M. into the toilet of her jail cell:

> "At approximately 1242 while nursing staff were making attempt [*sic*] to order STAT US to jail for further evaluation per provider, deputies radioed over that medical was needed in Mike pod. Nursing staff responded immediately. Upon arrival, Ms. Moulton was sitting on her cell toilet with deputy at her side. She was holding her infant in her lap at this time who was pink and appeared to be breathing spontaneously without difficulty. Ms. Moulton spoke without difficulty, skin was pink, respirations even and unlabored. She advised she sat down on the toilet when she realized her mucous plug fell out along with fluid and lastly her infant. She states he fell the toilet and she immediately pulled him out following his arrival."

67. This late entry note is the only mention of a supposedly "stat" ultrasound.

68. The suggestion that there was any "stat" urgency to ordering an ultrasound is contradicted by SHP 0109, in which Defendant Harvey stated: "Provider made aware, verbal order given to *inquire if an US can be obtained today* in order to evaluate further."

69. A "stat" order would be an order for immediate and urgent action, not merely an order for something to happen "today." *See Terrance v. Northville Regional Psychiatric Hosp.*, 286 F.3d 834, 840 (C.A.6, 2002) ("'STAT' is a common medical abbreviation which is used to imply urgent or rush. It is derived from

---

[2] While the note was entered at 12:28 p.m., as explained in ¶ 51, the actual timing of this encounter between Ms. Moulton and the Defendant Harvey and other nurse(s) was earlier, at or around 11:31 a.m.

a Latin word *statim* which means immediately. STEDMAN'S MEDICAL DICTIONARY 1330 (23rd ed.1976).")

70. Records from Montgomery County Emergency Medical Service ("EMS") indicate that EMS was first called at 12:43:54.

71. And according to the same records, EMS arrived on the scene at 12:51:47, approximately 8 minutes (7 minutes 53 seconds) later.

72. EMS records further record that Ms. Moulton arrived at the hospital at Tennova Healthcare in Clarksville at 13:34:38.

73. All told, the amount of time that lapsed between when EMS was first called, and the time Ms. Moulton arrived at the hospital was approximately 50 minutes.

74. Had Defendants called EMS at 11:31 a.m., as they should have, it stands to reason Ms. Moulton could have feasibly and realistically been transported to the hospital and arrived 50 minutes later, at 12:21 am. Had this occurred, Ms. Moulton would have delivered her baby in a medically appropriate facility and not, instead, into a jail cell toilet.

75. When EMS arrived at the jail and evaluated Ms. Moulton, they noted the lack of prenatal care provided to Ms. Moulton:

> "Dispatched to county jail for pregnant female, possibly delivered, unknown how far along, no other details. U/a to jail, directed through jail to cell. Pt found sitting upright on commode In cell, holding onto neonate. Pt aao x 4, resps w/ease, skin p/w/d. Pt states knew she was pregnant, unknown gestation, possibly 6-7 mos. **Pt states started feeling mid/low abd cramping et pressure approx 2-3 hours ago. States she informed jail staff**. States sat on the commode "when the cramping got so bad." States felt

> herself delivering baby "and I reached down there and grabbed it." Time or deliver 1242. Pt has delivered placenta into the commode. Pt has no gross vag bleeding. Pt states mild pressure to abd, abd Is soft. **Pt has not received any prenatal care**."

76. As discussed, supra, baby A.M. suffered injuries including bacterial infections, including a blood infection of Gram-Positive Cocci and an eye infection of Citrobacter freundii as a result of delivery into the jail cell toilet.

77. Ms. Moulton was discharged back to the Montgomery County Jail on 8/29/23 (SHP 0126).

78. Ms. Moulton was again housed in solitary confinement in a medical pod unit away from the general population and her peers upon her return to the jail.

79. Housing Ms. Moulton in a medical pod unit by herself away from social interaction with her peers was contrary to ACOG's recommendation for postpartum care of pregnant inmates.

80. The ACOG opinion previously referred to as Exhibit C, *supra*, counsels:

> "Pregnant people should not be placed in solitary confinement. The mental health effects on people placed in restrictive housing can be compounded in pregnancy . . . Being in solitary confinement can limit access to timely health care, especially when urgent pregnancy concerns arise. Such housing also limits mobility-and often by default results in bedrest, which has documented harms in pregnancy . . . Furthermore, the practice of routinely placing pregnant people in medical isolation for the sole purpose of proximity to health care staff is not recommended when such arrangements limit access to programming, exercise, and social interaction. The practice of routinely placing pregnant people in medical isolation for the sole purpose of proximity to health care staff is not recommended when such arrangements limit access to programming, exercise, and social interaction."

81. On 8/29, Ms. Moulton complained of her isolating housing assignment and requested to be returned to general population. A note by Natalie Gugler records:

> "[Ms. Moulton] says that she is on the medical pod, but she is 'So ready to be medically cleared and moved to gen pop. Like tonight. Even yesterday.'"

(SHP 0126).

82. Ms. Moulton submitted an electronic grievance on 8/29/23, stating:

> "hello i am writing because i am very much ready to be medically cleared to go to gen pop/j pod. please. i feel great and have been here going on 12 days now. after having the baby n going thru everything the way it happened i know it will be good for my mind to be in general population as well. i have never caused any problems or altercations with fellow inmates n i am nothing but respectful to my higher authoraties as well. please can i be medically cleared to go to gen pop/j pod."

83. The response to this grievance was "Triaged to provider 08/30/23 1046 KBHarvey, RN."

84. Ms. Moulton submitted another grievance electronic message request to be moved from the medical pod on 8/29/23. She wrote:

> "[After] how everything went down im sure it will be good for my headspace as well to be in general population. i have never caused any problems or altercations with fellow inmates and i am nothing but respectful of my higher authorities. please can i be medicallly cleared asap! thank you for your time in this manner."

85. The response Ms. Moulton received was: "Whenever you are cleared i will look to move you."

86. Ms. Moulton was not moved from medical isolation to general population on 8/29/23.

87. On 8/30/23, Ms. Moulton again asked to be moved from the medical pod. (SHP 0123) (Ms. Moulton "wants to be dc'd from the medical pod.")

88. Ms. Moulton was not moved from medical isolation to general population on 8/30/23.

89. On 8/31/23, Ms. Moulton submitted another grievance, again asking to be moved to general population. That request read:

> "please can i be medically cleared to move to en pop/j pod. Im begging! i promise i am good to go... they originally said monday but that's too long n unnecessary. please can i move if not tonight then tomorrrow.. i heard there is a handful of beds open now n w.e i need to do im Request r e a d y . please please move me to j pod already i cant stand med pod.. it would be great for my soul to move to j pod ASAP! PLEASEEE! thank u for your time."

90. The response Ms. Moulton received from "Medical Staff" was:

> "Due to being postpartum you are to be on a bottom bunk. With this medical order in place you will remain in medical pod. This is for your safety and to prevent postpartum complications."

91. Ms. Moulton submitted a reply to this message, stating:

> "they have me on a boat on the floor AND im upstairs in med pod. this seems more difficult then putting me anywhere in j pod. PLEASE move me today. when i saw the nurse wednesday she said she felt comfortable with moving me monday. im BEGGING YOU PLEASE get me out of med pod. it would do nothing but good for my mind n soul to be with the other girls in j pod/general population. PLEASEEEEE. i am fine n i have been fine since ive been back from the hospital. PLEASE MOVE ME TO J POD TODAY PLEASEEE. I AM SERIOUSLY BEGGING U! thank u for your time."

92. Ms. Moulton was not moved from medical isolation on 8/31/23.

93. On 9/1/23, Ms. Moulton again asked to be moved from the medical pod. (SHP 0110) ("Pt is requesting to be moved out of medical pod. I spoke with provider

and she instructs that she is to remain in medical pod until next week") (note by April Lowe).

94. Ms. Moulton was not moved to general population on 9/1/23.

95. On 9/4/23, at 12:54 P.M., Ms. Moulton submitted another electronic request, this one increasingly desperate in tone, asking to be moved from the isolation of the medical pod:

> "i am fine n have beeen ready to move to j pod since i got back from the hospital. the nurse originally said monday n thats today so please move me to j pod today. i NEED this for my mind body n soul. please get me out of med pod n move me to j pod/gen pop today. PLEASE Request I M BEGGING YOU! they have me on a boat on the floor AND im upstairs in med pod. thats more difficult than putting me anywhere in j pod n im sure there are bottom bunks available over there. PLEASE MOVE ME TO J POD TODAY PLEASEEE! thank you for your time."

96. The reply that Ms. Moulton received to this message was:

> "I will relay this over to the provider and medical director. They will be the ones to decide if they can clear you to move. However, medical does not choose what days they move people."

97. Again on 9/4/23, at 5:11 P.M., Ms. Moulton submitted another grievance, again asking to be moved from medical isolation. That grievance read:

> "I was told by the head nurse i would be medically cleared today to move to j pod, can i PLEASE move to j pod/gen pop today please IM BEGGING YOU! i cant stand another min in med pod and it would do my mind heart and soul great things to be in j pod with the other ladies. PLEASE!"

98. The response entered into the system was: "Inmate released from custody."

99. Ms. Moulton was released on 9/5/23.

100. As a result of the above events, Ms. Moulton suffered severe physical and psychological injuries.

## CAUSES OF ACTION:

### I. 42 USC § 1983 Claim for Deliberate Indifference to Serious Medical Needs of Alyssia Moulton (Fourteenth Amendment) as to Defendants Tapp, Purifoy, Harvey, and J. Doe Defendants

101. Plaintiffs reincorporate all above paragraphs.

102. Defendants are liable to Plaintiff Alyssia Moulton for deliberate indifference to her serious medical needs.

103. Defendant Miranda Tapp is liable to Ms. Moulton for deliberate indifference to Ms. Moulton's serious medical needs in that:

a. Tapp failed to schedule appropriate pre-natal care, including evaluation by an appropriate professional.

b. Tapp failed to perform an ultrasound to confirm gestational dating of Ms. Moulton's baby.

c. Tapp allowed Ms. Moulton to "detox" from opioid use without providing medication therapy.

d. Tapp allowed Ms. Moulton to be placed in solitary confinement.

e. Tapp was aware that Ms. Moulton was pregnant, was using opioids, was experiencing opioid withdrawal, and had no prenatal care whatsoever prior to incarceration.

f. Tapp was further aware that Ms. Moulton's report of her LMP could not be trusted as Ms. Moulton had not even known she was pregnant until a positive pregnancy test at the jail confirmed her pregnancy.

g. A reasonable person in Tapp's position faced with the knowledge that Tapp had concerning Ms. Moulton would know that the above acts and omissions would pose a serious risk of harm to Ms. Moulton, especially the risks posed by acute withdrawal from opioids.

h. Tapp nevertheless disregarded this risk by failing to provide for appropriate medication therapy for Ms. Moulton.

104. Defendant Denise Purifoy is liable to Ms. Moulton for deliberate indifference to Ms. Moulton's serious medical needs as discussed *supra*, in that:

a. Purifoy was aware that Ms. Moulton was pregnant.

b. Purifoy was aware that Ms. Moulton had experienced acute opioid withdrawal symptoms during her incarceration.

c. Purifoy was aware that Ms. Moulton had not received any prenatal care during pregnancy.

d. Purifoy was aware that no ultrasound had been performed to confirm gestational dating of Ms. Moulton's baby.

e. Purifoy was aware that Ms. Moulton complained of heartburn.

f. A reasonable person in Purifoy's position would know that heartburn in a pregnant women can be a sign of labor, especially in women in their third trimester, as Ms. Moulton was.

g. Purifoy thus was aware of the risk that Ms. Moulton was experiencing a serious medical need in the form of a pregnancy complication.

h. Purifoy took no affirmative action to help Ms. Moulton and provided no actual care.

i. Purifoy thus disregarded the risk of harm to Ms. Moulton, including the inevitable and foreseeable risk that she would deliver a baby in an medically inadequate jail cell.

105. Defendant Kayla Harvey and the J. Doe Defendant nurses are liable to Ms. Moulton for deliberate indifference to Ms. Moulton's serious medical needs in that:

a. Harvey and the J. Doe Defendants were aware that Ms. Moulton was pregnant.

b. Harvey and the J. Doe Defendants were that Ms. Moulton was detoxing from opioids.

c. Harvey and the J. Doe Defendants were aware that Ms. Moulton was not taking appropriate opioid substitution medications.

d. Harvey and the J. Doe Defendants were aware that Ms. Moulton complained of contractions.

e. Harvey and the J. Doe Defendants were aware that Ms. Moulton was asking to be taken to the hospital urgently.

f. Harvey and the J. Doe Defendants were aware that Ms. Moulton's estimate of her LMP was likely inaccurate.

g. Harvey and the J. Doe Defendants were aware that the inevitable consequence of labor in a pregnant woman is the delivery of a baby.

h. Harvey and the J. Doe Defendants were consciously disregarded the risk of this inevitable consequence by failing to arrange for Ms. Moulton to be transferred to an appropriate medical facility of similarly medically suitable location for the birth of her child.

106. As a result of the above acts of deliberate indifference to serious medical needs, Ms. Moulton suffered severe injuries and mental distress.

## II. 42 USC § 1983 Claim for Substantive Due Process Violation – Special Relationship Liability as to All Defendants (Baby A.M.)

107. Plaintiffs reincorporate all above paragraphs.

108. Defendants, at all relevant times hereto, were acting under color of state law.

109. At all relevant times, Baby A.M. had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution not to be deprived of liberty without due process of law, which encompassed his right to reasonable medical care.

110. Defendants' actions and inactions deprived Baby A.M. of his clearly established constitutional right to be free from deprivations of liberty without due process of law.

111. Baby A.M. had a special relationship with Defendants, in that he was in Defendants' legal custody and detention against his will at the time of his birth, and unable to provide or seek care for his own serious medical needs. That special relationship triggered an affirmative duty to protect Baby A.M. from harm.

112. Defendants breached their affirmative duty to protect Baby A.M. by failing to ensure his safety from the risk of harm that lack of medical care presented, even though Defendants were on notice that Baby A.M.'s birth was imminent, and that Baby A.M. required special care during and immediately following his birth. These actions or inactions substantially depart from accepted professional judgment, practice or standards, and from the duty to

provide reasonable care under all the circumstances and created the conditions that caused the lack of medical care provided to Baby A.M.

113. Defendants' conduct, as described herein, was intentional, willful, and wanton, and shocks the conscience.

114. Defendants' acts and omissions caused Baby A.M. damages in that A.M. suffered physical and mental injury, pain, discomfort, and unnecessary risks because their acts and failures to act. Thus, Defendants' conduct resulted in a denial of Baby A.M.'s substantive due process rights.

### III. Medical Negligence and Treatment (Plaintiffs Against Defendants SHP And Individual SHP Employees)

115. Plaintiffs reincorporate all above paragraphs.

116. At all times relevant to this action, Plaintiffs were under the medical responsibility of the Defendant SHP and its individual employees.

117. The Defendants Purifoy, Tapp, Harvey, and J. Doe Defendants had a nurse-patient relationship with Plaintiffs at all times.

118. During the course of this medical treatment, Defendants were negligent in their care and treatment of Plaintiffs.

119. Defendant SHP is vicariously liable for the medically negligent acts of the individual Defendant nurses Purifoy, Tapp, Harvey, and J. Doe Defendants.


Case 3:24-cv-00954 Document 1 Filed 08/06/24 Page 28 of 32 PageID #: 28

## IV. 42 USC § 1983 Claim by Both Plaintiffs for Municipal Liability as so Defendant SHP (Failure To Train)

120. Plaintiffs reincorporate all above paragraphs.

121. Defendant SHP may be held liable for the constitutional wrongs of the Defendant nurses based on a theory of municipal liability for its failure to train these nurses in the face of an obvious need and in the face of an obvious risk of constitutional harm in an extremely foreseeable setting likely to recur—namely, incarcerated pregnant women and the need for prompt and adequate medical care in all phases of pregnancy, including pre-natal care, labor and delivery, and post-partum care.

122. Defendant SHP failed to train its employees on the appropriate medical treatment of incarcerated pregnant women, including in the provision of appropriate pre-natal care.

123. Defendant SHP failed to train its employees on the appropriate medical treatment of incarcerated pregnant women, including in the provision of appropriate care during labor and delivery, including identifying signs of labor in pregnant patients and in providing prompt medical treatment to pregnant inmates.

124. Defendant SHP failed to train its employees on the appropriate medical treatment of incarcerated pregnant women, including in the provision of appropriate care during the post-partum period, including

not placing post-partum women in medical isolation and solitary confinement.

125. The failure to provide appropriate training to medical staff with respect to appropriate medical care for pregnant inmates was the moving force behind the constitutional violations in this case—namely, the deliberate indifference to the serious medical needs of Alyssia Moulton and the violation of Baby A.M's substantive due process rights.

## PRAYER FOR RELIEF

126. Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law and equity, including, but not limited to the following:

a. Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, discomfort, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;
b. Punitive damages for all claims as allowed by law in an amount to be determined at trial
c. Attorney's fees and costs; and
d. Such further relief as justice requires.

Respectfully submitted,

DRS LAW

*/s/ Christopher Smith*
David Randolph Smith, TN BPR#011905
Dominick R. Smith, TN BPR # 028783
Christopher W. Smith, TN BPR #034450
1913 21st Avenue South
Nashville, Tennessee 37212
(615) 742-1775 phone
(615) 742-1223 fax
csmith@drslawfirm.com

*Attorneys for Plaintiff*