*NCCHC presents this document as a useful resource for correctional health professionals. It is not an official NCCHC position or guideline. For additional resources, visit www.ncchc.org.*

# PREGNANCY AND POSTPARTUM CARE IN CORRECTIONAL SETTINGS

*By Carolyn Sufrin, MD, PhD*

*Endorsed by the American College of Obstetricians and Gynecologists (ACOG), March 2018, and should be construed as ACOG clinical guidance.*

The majority of incarcerated women are of childbearing age and some will enter jail or prison pregnant. Limited systematic information exists on the prevalence and outcomes of pregnancies for women in custody. The most recent estimates of prevalence are from 2004-2005, with 3% to 5% of incarcerated women reporting being pregnant at intake. The only systematic assessment of births is from 1998, documenting 1,400 births to women in prison annually.

Pregnant women have unique health care and psychosocial needs. Pregnancies of incarcerated women are often high risk due to poor nutrition, limited access to prenatal care, domestic violence, mental illness, and drug and alcohol dependence. Optimizing maternal health, providing prenatal care, addressing pregnant women's symptoms in a timely manner, and referral to a specialist when indicated are important for ensuring a healthy maternal–fetal unit and healthy birth outcomes. Physiologic changes of pregnancy and additional nutritional needs require correctional facilities to modify standard custodial routines, such as supplying additional food, housing women in a lower bunk, and having light-duty work assignments. Many symptoms that may be less concerning in a nonpregnant woman, such as vaginal bleeding, abdominal pain, or a headache, can be signs of serious pregnancy complications and need to be evaluated expeditiously. Incarcerated pregnant women also face the challenge that in most cases they will be separated from their newborn after birth.

**Screening for Pregnancy on Entry to the System**

All women at risk for pregnancy should be offered a pregnancy test within 48 hours of admission. Sexually active women remain at risk for pregnancy until they go through menopause (complete cessation of menses for more than 12 months) either naturally (average age in the United States is 51) or surgically (hysterectomy or removal of both ovaries). Women who use a regular, reliable method of contraception are at low risk of pregnancy. However, even methods such as intrauterine devices or tubal ligation have a risk of failure; if a woman has symptoms of pregnancy, a pregnancy test should be performed. A simple approach would be to offer pregnancy testing to all women under the age of 55. Women with a negative test on entry who are at particularly high risk for pregnancy— those who have had unprotected sex within the month before incarceration—should have the test repeated 2 weeks later. Women who have had conjugal visits or furloughs should also be offered pregnancy tests.

Early identification of pregnancy is important to ensure that women receive appropriate prenatal care or, if abortion care is desired, timely referral given the time-sensitive nature of pregnancy termination. Early identification of pregnancy is also important so that pregnant women do not receive teratogenic medications or go through withdrawal from opiates. In addition, women entering correctional facilities may have a higher risk of ectopic pregnancy because of high rates of prior infection with gonorrhea and chlamydia or pelvic inflammatory disease. Many women have not accessed health care in the community and might not be aware that they are pregnant. Simultaneously, research has shown that as many of 72% of them were sexually active and not using a regular method of birth control before incarceration. Screening for pregnancy upon entry also offers an opportunity to provide eligible women with emergency contraception.

The most reliable way to screen for pregnancy is to perform a urine pregnancy test. Asking when a woman's last menstrual period (LMP) occurred can also screen for pregnancy, as women with regular periods whose LMP was less than 30 days ago are less likely to be pregnant. However, chronic stress and substance abuse can make LMP unreliable in assessing for pregnancy in this population. Research has shown that up to 40% of these women have irregular periods.


Case 3:24-cv-00954 Document 1-1 Filed 08/06/24 Page 1 of 9 PageID #: 33

## General Care for Pregnant Women

Being pregnant while incarcerated presents unique physical and psychological challenges. Correctional health staff have a specific duty to provide for the clinical and emotional needs of the pregnant inmate. Pregnancy should not be viewed as a disease, disorder, or malady and the institution should provide a healthy environment where a woman can safely care for her developing fetus. Upon diagnosis of pregnancy, it is standard of care to ask the woman about her desire to continue the pregnancy, to have an abortion, or to put the child up for adoption. Correctional facilities must provide nondirective counseling and appropriate referrals and clinical care in accordance with the woman's decision, including if she chooses abortion.

## Prenatal Care

Early and regular prenatal care is one of the best ways to promote a healthy pregnancy. Prenatal care in correctional facilities must reflect national standards, including visit frequency with a qualified prenatal care provider, screening and diagnostic tests, and referrals for complications. In low-risk pregnancies, visits typically occur every 4 weeks up until 28 weeks gestation, every 2 weeks until 36 weeks gestation, and weekly thereafter. However, most incarcerated women have high-risk pregnancies and this should be taken into account when determining frequency of prenatal visits. To ensure that national guidelines are followed, facilities must have arrangements with a local provider for high-risk pregnancy care. Whether routine prenatal care is provided on-site, off-site, or a combination of the two, correctional health staff must be aware of common pregnancy symptoms and indications for referral.

The initial prenatal visit includes a physical exam and a comprehensive obstetrical, gynecological, medical, mental health, family, and social history. Women with coexisting or newly diagnosed medical conditions should be cared for in conjunction with a specialist. Special attention should be paid to drug and alcohol abuse and histories of sexual, physical, and intimate partner violence, as these are exceedingly common among incarcerated women. Initial laboratory screening includes a complete blood count, hepatitis B, syphilis, HIV, blood type and antibody screen, rubella, varicella, gonorrhea and chlamydia, and urine culture.

HIV is more common in women entering correctional settings than in the general population; both pregnancy and incarceration are times when many women are first diagnosed with HIV. The Centers for Disease Control and Prevention recommends universal opt-out HIV screening for pregnant women; with early detection, prevention of mother-to-child transmission can be accomplished with appropriate monitoring and antiretroviral medications, managed by someone with expertise in caring for HIV+ pregnant women. The routine prenatal screen should also include tuberculosis, either by PPD or Quantiferon, and hepatitis C, given its high prevalence of in correctional populations.

Genetic screening for aneuploidy is offered to all pregnant women with a variety of serum, ultrasound, and procedural tests in the first and second trimesters. Counseling to help women choose whether to be screened should review the risks and benefits, including the false-positive rate. National guidelines describing current recommended screening tests should be followed. Women with abnormal screening tests must be referred for appropriate counseling and possible diagnostic testing. Correctional facilities should have arrangements for counseling and screening with advance notice given the time-sensitive nature of the screening tests.

Ultrasounds are commonly performed in the first trimester to confirm gestational dating. This may have particular relevance among incarcerated women, who are often uncertain about the dates of their LMP. Accurate determination of the gestational age assists with providing appropriate prenatal care, including timely referral for aneuploidy screening, and in case complications of pregnancy arise. A sonographic anatomic survey of the fetus is typically performed between 18 and 20 weeks. Subsequent ultrasounds are performed when specific indications exist.

Follow-up prenatal visits measure weight gain, blood pressure, and dip urine for protein; assess fetal heart tones (beginning at 10 to 12 weeks); screen women, at the appropriate gestations, for symptoms of


Case 3:24-cv-00954 Document 1-1 Filed 08/06/24 Page 2 of 9 PageID #: 34

preterm or term labor and for fetal movement; and measure fundal height for fetal growth (beginning at 20 weeks). All pregnant women are screened for gestational diabetes between 24 and 28 weeks gestation, with earlier testing being performed on high-risk women (obesity, family history of diabetes, prior history of gestational diabetes, macrosomia, or shoulder dystocia). Women whose blood type is Rh negative receive a prophylactic dose of Rh immunoglobulin at 28 weeks. To prevent group B streptococcus (GBS) disease in the newborn, all pregnant women are screened with a vaginal-rectal swab for GBS between 35 and 37 weeks so that positive women are given prophylactic antibiotics in labor.

**Nutrition and Activity**

Pregnant and postpartum women have additional nutritional needs and should be counseled on the importance of adequate nutrition. Diets provided by correctional institutions should be specialized to the women's needs and be rich in whole grains, calcium, and fruits and vegetables. In the second and third trimesters, women require an additional 300 calories per day. Pregnancy-related nausea, cravings, and smaller gastric capacity are reasons why more frequent snacks and meals work better for many pregnant women; snacks should be provided outside of scheduled meal times when possible.

Pregnant women must also receive prenatal vitamins that contain, among other essential vitamins and minerals, 400 mcg to 800 mcg of folic acid, which is important for the prevention of neural tube defects. Women with documented anemia (hemoglobin < 11) should receive additional iron supplementation. Cold cuts, unpasteurized foods, and raw or undercooked meats may contain listeria; this infection can be catastrophic in pregnant women and for this reason pregnancy diets should avoid such foods. Guidelines for weight gain in pregnancy vary according to a woman's pre-pregnancy body mass index (BMI) and by trimester. Normal-weight women should have a total weight gain of 25 to 35 pounds, overweight women (BMI 25-29.9 kg/m2) 15 to 25 pounds, and obese women (BMI ≥ 30 kg/m2) 11 to 20 pounds.

Activity for pregnant women must take into account the physical constraints of being in a correctional facility. All pregnant women must have a bottom bunk so that they do not risk falling from a top bunk. Certain work assignments may be inappropriate, especially if duties include exposure to harmful substances, prolonged standing, heavy lifting, or extreme temperatures. Work assignments should be adjusted accordingly. In the absence of medical or obstetric complications, 30 minutes or more of moderate exercise a day on most, if not all, days of the week is recommended.

**Drug and Alcohol Use in Pregnancy**

More than half of incarcerated women struggle with drug and alcohol use disorder. Pregnant inmates should be screened for alcohol and drug use, and counseled on the risks of exposure to their developing fetus. Fetal alcohol exposure leads to a spectrum of disorders that may include speech and language impairment, heart defects, and other physical and neurodevelopmental impairments. Drug use with intravenous needles puts the pregnant woman and therefore the fetus at risk for contracting HIV and hepatitis. Stimulants increase the risk of placental abruption, preterm birth, stillbirth, and fetal growth restriction. Chronic untreated heroin use in pregnancy is associated with fetal growth restriction, preterm labor, and other complications. Acute withdrawal from opiates is also risky for the developing fetus and has been shown to be associated with miscarriage and stillbirth, and can interfere with placental function.

Screening for drug and alcohol use is a first step and is followed up with referral to treatment. For women who report opiate use, the standard of care is not to detoxify from opiates during pregnancy due to the fetal risks of withdrawal. Rather, the standard of care is to provide opioid substitution therapy with methadone or buprenorphine for the duration of their pregnancy, in conjunction with prenatal care and appropriate mental health care and psychosocial services. To stabilize a woman on a dose and to avoid withdrawal, inpatient hospitalization is sometimes necessary. Dose monitoring and adjustment is done by a health care provider experienced in the care of addiction treatment of pregnant women. Neonatal abstinence syndrome is common and treatable among opioid-agonist-exposed infants, but may cause anxiety for inmates who have given birth, especially since they are separated from their newborns.


Case 3:24-cv-00954 Document 1-1 Filed 08/06/24 Page 3 of 9 PageID #: 35

### Avoiding Teratogenic Medications

Some medications are safe in pregnancy and some are not. The U.S. Food and Drug Administration's Pregnancy and Lactation Labeling Rule (PLLR) provides detailed information on the safety of medications in pregnancy and while breastfeeding; it can be accessed online. Health care providers must take care to avoid giving pregnant women medications identified by the PLLR as exposing the developing fetus to harm. For example, doxycycline is sometimes used to treat chlamydial infections, which are common among incarcerated women, but doxycycline is contraindicated in pregnancy because of adverse effects on skeletal development. NSAIDs are to be avoided because of renal and cardiac effects on the fetus. For women who are on medications for medical conditions or mental health diagnoses, consultation should be sought immediately as to whether medications should be continued or changed. Medications should not be discontinued without consultation with an expert.

### Antenatal Pregnancy Symptoms and Complications

Although pregnancy is not a pathologic state, complications can arise at any point, such as miscarriage, preterm labor, preeclampsia, and many others. Pregnant women with infections are also at higher risk for progressing to systemic illness due to their relative immunosuppression. The signs and symptoms of these conditions can often be subtle, such as light spotting, cramping, headaches, nausea, or mildly elevated blood pressure. Correctional health professionals must recognize the subtlety of these signs and that they are managed differently in pregnant women. Since custody staff are typically the first point of contact for incarcerated pregnant women with symptoms, they should be trained to call medical personnel for any symptoms.

Many pregnant women experience discomfort including nausea and vomiting, shortness of breath, swelling, and fatigue. Living in a correctional facility limits women's abilities to ameliorate their symptoms on their own. Facilities should be sensitive in making accommodations to minimize discomfort. For instance, since as many as 70% to 85% of women experience nausea and vomiting during pregnancy, it is important to enable access to adequate hydration and modified activity.

### Vaccinations in Pregnancy

Vaccinations are important public health tools to prevent the transmission of certain diseases. Some vaccines—especially live vaccines— are to be avoided in pregnancy while others are recommended. Given that pregnant women exposed to influenza are more prone to severe illness, national guidelines recommend that women who are pregnant during influenza season be vaccinated with the inactivated vaccine. Given the persistent rise in pertussis disease, Tdap (tetanus, diphtheria, pertussis), which is known to be safe in pregnancy, is recommended in every pregnancy; to maximize maternal response and transfer to the newborn, the vaccine ideally should be given between 27 and 36 weeks gestation, but can be given at any point.

### Labor and Delivery

Pregnant inmates must deliver at an appropriate health care facility. Labor can be a difficult diagnosis to make and should be made by a qualified health care professional, which may require off-site transport for evaluation. While painful, regular uterine contractions with cervical change are the hallmark signs of active labor, there is no absolute cutoff for frequency of contractions at which labor can be diagnosed. Other signs of labor can be more subtle, such as light vaginal bleeding or vomiting. Preterm labor can be particularly subtle, with mild cramps or back pain indicating preterm labor. Due to the time necessary to arrange transport to a nearby hospital, there is a low threshold to send pregnant inmates out for evaluation of labor when signs or symptoms of labor or ruptured membranes are present. Women with such signs or symptoms must be evaluated expeditiously by someone qualified to assess for labor. Doula support of pregnant incarcerated women while they are in labor at the hospital has been shown to improve obstetrical outcomes and can provide emotional support during childbirth. While in labor and during prenatal visits, correctional staff must respect women's privacy, especially during pelvic exams and childbirth.


Case 3:24-cv-00954 Document 1-1 Filed 08/06/24 Page 4 of 9 PageID #: 36

Any facility that houses pregnant women should have an emergency delivery kit available on-site, and health staff should be trained in its use in the event that a delivery occurs in the facility.

**Nonuse of Restraints and Isolation in Pregnancy**

Restraints pose significant health risks to the mother and her fetus during labor, transport for labor, delivery, postpartum recovery, and antenatally. They interfere with medical professionals' abilities to provide necessary care during obstetrical emergencies throughout pregnancy, childbirth, and the postpartum period. They also can increase the risk of falls and prevent a pregnant inmate from breaking a fall, which can lead to direct abdominal trauma, which can then result in placental abruption, maternal hemorrhage, and even stillbirth. Restraints are not used during active labor and delivery.

If restraints are deemed absolutely necessary for security at points outside of labor and delivery, abdominal restraints, leg and ankle restraints, restraints behind the back, and chaining to another inmate must not be used. Restraints must be removed when a medical professional caring for the woman determines that removal is medically necessary. When restraints must be used, facilities should document these instances, including the type of restraint and the indication for their use.

International standards and the position of NCCHC state that pregnant women should never be placed in solitary confinement as they are especially susceptible to its harmful psychological effects. In addition, placing these women in isolation impedes their access to necessary and timely pregnancy care.

**Child Care Arrangements**

Planning for what happens to the newborn after childbirth is an important part of caring for pregnant incarcerated women. Efforts to forge this plan should be made early so all are prepared when the woman gives birth. Several correctional facilities have nursery programs that allow mothers and infants to stay together after childbirth, with supervision and parenting classes; such programs have been shown to improve women's feelings of attachment toward their children and reduce recidivism. However, most facilities do not have nursery programs. Correctional staff should assist women in making arrangements for their newborns, including assistance with official paperwork. Ideally, the woman may identify a family member or other responsible party to care for her child while she remains in custody. If the mother wishes not to have custody of her child, adoption is another option. When the mother does not have a responsible party to care for her newborn, the state assumes both custody of the child and responsibility for placement.

**Postpartum, Breastfeeding, and Support for Mother–Infant Bonding**

Mother–infant attachment is critical for the infant's psychological development and the mother's mental health. Most women who give birth while incarcerated will be separated from their newborns once they are discharged from the hospital. Maximizing opportunities for mother–infant bonding while the woman is in the hospital during her postpartum recovery should be encouraged. Upon the mother's return to the correctional facility, contact visits with the baby should be facilitated as these can foster bonding and have a positive impact on the inmate's well-being as well as the infant's psychological development.

During the 6- to 8-week postpartum recovery period, women's bodies undergo physiologic changes; women may experience bleeding, cramping, and pain associated with a vaginal laceration from delivery or healing from a cesarean section. Appropriate accommodations should be made, such as allowing women to rest when needed. Ambulation is an important part of postpartum recovery as it helps prevent deep vein thrombosis and bed rest should be avoided. Discharge instructions from the hospital, which may include postpartum blood pressure monitoring or diabetes screening, should be adhered to.

The American College of Obstetricians and Gynecologists and the American Academy of Pediatrics recommend exclusive breastfeeding for the first 6 months. Breast milk has been shown to have numerous short-term and long-term benefits for newborns, including lower risk of respiratory and ear infections, allergic disease, obesity, and type 2 diabetes. Breastfeeding also has benefits for mothers, such as


Case 3:24-cv-00954 Document 1-1 Filed 08/06/24 Page 5 of 9 PageID #: 37

reduced risk of developing diabetes and psychological benefits. The mother–infant separation imposed by incarceration disrupts the ability for full breastfeeding. However, many facilities have successful programs that allow mothers to pump breast milk with manual or electric breast pumps; milk is stored in the clinic until it can be delivered to the infant's guardian. Breast milk can be kept at room temperature for 6 to 8 hours; it can be stored in a refrigerator for up to 5 days and in a freezer for up to 6 months. Breastfeeding women should receive a well-balanced diet with supplementation to ensure appropriate intake of vitamins and minerals.

**Antepartum and Postpartum Mental Health Issues**

In the United States, 500,000 pregnant women each year have or will develop psychiatric illness during pregnancy. Among incarcerated women, nearly three quarters have symptoms of a psychiatric illness; thus, pregnant inmates are at high risk of mental health disorders, ranging from major depression to bipolar disorder and schizophrenia. Identifying and treating these women is critical to ensure a healthy pregnancy, a stable mother, and optimal neonatal outcomes. Many women will require pharmacologic treatment during pregnancy. Although all psychotropic medications cross the placenta, many of these drugs are safe in pregnancy. The risks of exposure to medications must be balanced against the risks of inadequately treated mental illness, including adverse obstetrical outcomes. For instance, women whose antidepressants are discontinued in pregnancy have a 68% risk of relapse. All pregnant incarcerated women should be screened for mental illness. Those with a known diagnosis or who screen positive, especially if they are suicidal or have psychotic symptoms, must be referred to a mental health professional. If a pregnant woman is already taking psychotropic medication, this should be continued and consultation with an expert should be obtained.

The postpartum period is an especially vulnerable period for women with mental illness due to hormonal fluctuations, fatigue, and emotional factors. For instance, rates of relapse with bipolar disorder range from 32% to 67%, with a 46% increased risk of postpartum psychosis. Women who give birth while incarcerated are at higher risk of postpartum mental health issues due to the emotional distress of being separated from their newborns. Postpartum depression has a prevalence of 12% to 20% in the general U.S. population and is likely higher among incarcerated women due to predisposing factors. Postpartum depression differs from the "baby blues," which are transient feelings such as sadness, anger, or anxiety occurring within a few days after childbirth and typically resolving after 1 or 2 weeks. In contrast, postpartum depression symptoms are more pronounced, often limit daily functioning, and can appear at any point within 1 year of giving birth. Antidepressants and psychotherapy are mainstays of treatment. Correctional health care providers should maintain vigilance for signs and symptoms of postpartum depression, with routine screening using validated tools at least 2 weeks and 6 weeks postpartum.

**Postpartum Contraception**

A woman may be interested in avoiding pregnancy in the period immediately after giving birth. Preventing short-interval pregnancies reduces the risk of preterm birth and other pregnancy complications. Although many women who give birth while incarcerated will not be able to engage in sexual relations for some time, the postpartum period offers an opportunity to discuss family planning and to initiate an effective method; this is especially true for women whose release date is approaching and for women in jail whose release may be unpredictable. Nearly all birth control methods can be safely started in the postpartum period, depending on coexisting medical conditions, including the highly effective, long-acting methods such as subdermal implants and intrauterine devices that can be inserted immediately postpartum.

Postpartum tubal ligation, performed immediately after delivery, is a special case of postpartum contraception. The procedure is not reversible and leads to permanent sterility; sterilization operations can safely be done at a future date. When considering whether this service is available to women in custody, correctional staff must consider these factors and that women may feel undue pressure. Facilities also should take into account state and federal laws that may restrict the ability to provide sterilization to people who are in custody (42 CFR 50.201-206).


Case 3:24-cv-00954 Document 1-1 Filed 08/06/24 Page 6 of 9 PageID #: 38

**Continuity of Care**

Records of prenatal visits and laboratory screening tests must accompany a pregnant inmate when she goes to an outside provider for care antenatally and for labor and delivery. If a woman is released while pregnant, the facility must assist in coordinating follow-up prenatal care in the community, including providing records. Continuity for pregnant women also involves assistance with enrollment in available insurance and scheduling an appointment before release. This ensures safe, timely care for the woman and her developing fetus. Such coordination and continuity are also important for postpartum women who are released and who have medical and mental health care needs that require follow-up.

**Correctional Barriers**

As discussed throughout this paper, there are several barriers to pregnancy care in the correctional setting. One barrier is the lack of health staff on-site who are trained specifically in the care of pregnant women and who can provide prenatal care and triage symptoms as they arise. Because the symptoms of many worrisome conditions of pregnancy can be subtle and nonspecific, pregnant women require frequent transport off-site for evaluation, which can be impeded by logistical barriers. The correctional environment may interfere with women's abilities to ameliorate or may exacerbate common discomforts of pregnancy, such as beds or being able to eat smaller, more frequent meals. Usual security precautions that are applied to nonpregnant inmates, such as the use of restraints, pose risks for pregnant women. Being pregnant while incarcerated can be emotionally isolating, especially with the knowledge of impending separation from one's newborn. Because of restrictions on hospital visitation, these women typically go through childbirth without a support person, which exacerbates their feelings of isolation and emotional distress. Barriers to enabling women to provide breast milk to their newborns include limited visitation times, equipment, logistical coordination with outside infant caregivers, and privacy for pumping.

**Contributor**

Carolyn Sufrin, MD, PhD, is an assistant professor in the department of gynecology and obstetrics at the Johns Hopkins University School of Medicine, Baltimore, MD. She serves on the NCCHC board of directors as the liaison of the American College of Obstetricians and Gynecologists.

**Resources**

ACOG Practice Bulletin #92, Use of Psychiatric Medications During Pregnancy and Lactation (2008; reaffirmed in 2016). American College of Obstetricians and Gynecologists. *Single copies available upon request. Please contact the ACOG Resource Center via email:resources@acog.org, phone: 202-863-2518, or fax: 202-863-1595.*

Antepartum Record (provider form). American College of Obstetricians and Gynecologists. https://www.acog.org/About-ACOG/ACOG-Departments/Patient-Records. *Single copies available upon request. Please contact the ACOG Resource Center via email: resources@acog.org, phone: 202-863-2518, or fax: 202-863-1595.*

Best Practices for Nutrition Care of Pregnant Women in Prison (2017). Shlafer et al. *Journal of Correctional Health Care*. http://journals.sagepub.com/doi/10.1177/1078345817716567

Best Practices in the Use of Restraints With Pregnant Women and Girls Under Correctional Custody (2012). National Task Force on the Use of Restraints with Pregnant Women Under Correctional Custody, U.S. Department of Health and Human Services. http://cjinvolvedwomen.org/sites/all/documents/Best-Practices-Use-of-Restraints-Pregnant.pdf

Breastfeeding and the Use of Human Milk (Policy Statement) (2012). American Academy of Pediatrics. http://pediatrics.aappublications.org/content/129/3/e827.full.pdf


Case 3:24-cv-00954 Document 1-1 Filed 08/06/24 Page 7 of 9 PageID #: 39

Breastfeeding in Underserved Women: Increasing Initiation and Continuation of Breastfeeding (2013; reaffirmed 2016). American College of Obstetricians and Gynecologists Committee on Health Care for Underserved Women.
http://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Breastfeeding-in-Underserved-Women-Increasing-Initiation-and-Continuation-of-Breastfeeding

Breastfeeding Residency Curriculum: Prepared Presentations (Policy Statement) (2012). American Academy of Pediatrics.
http://pediatrics.aappublications.org/content/129/3/e827.full.pdf

Cell-free DNA Screening for Fetal Aneuploidy (2015; reaffirmed 2017). American College of Obstetricians and Gynecologists and the Society for Maternal-Fetal Medicine.
https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Genetics/Cell-free-DNA-Screening-for-Fetal-Aneuploidy

Health Care for Pregnant and Postpartum Incarcerated Women and Adolescent Females (2011; reaffirmed 2016). American College of Obstetricians and Gynecologists Committee on Health Care for Underserved Women.
https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Health-Care-for-Pregnant-and-Postpartum-Incarcerated-Women-and-Adolescent-Females

Health Care Guideline: Routine Prenatal Care (2012). Institute for Clinical Systems Improvement.
https://www.icsi.org/_asset/13n9y4/Prenatal.pdf

Immunization and Pregnancy (2013). Centers for Disease Control and Prevention, National Center for Immunization and Respiratory Diseases.
http://www.cdc.gov/vaccines/pubs/downloads/f_preg_chart.pdf

Influenza Vaccination During Pregnancy (2014; reaffirmed 2016). American College of Obstetricians and Gynecologists Committee on Obstetric Practice and Immunization Expert Work Group.
http://www.acog.org/Resources_And_Publications/Committee_Opinions/Committee_on_Obstetric_Practice/Influenza_Vaccination_During_Pregnancy

Medical Problems of Jail Inmates (Special Report) (2006). Maruschak, L. M. Bureau of Justice Statistics.
https://www.bjs.gov/content/pub/pdf/mpji.pdf

Medical Problems of Prisoners (2008). Maruschak, L. M. Bureau of Justice Statistics.
https://www.bjs.gov/content/pub/pdf/mpp.pdf

NSGC Practice Guideline: Prenatal Screening and Diagnostic Testing Options for Chromosome Aneuploidy (2013). Wilson, K. L., et al. Available at the National Guideline Clearinghouse.
http://www.guideline.gov/content.aspx?id=43950

Opioid Use and Opioid Use Disorder in Pregnancy (2017). American College of Obstetricians and Gynecologists and the American Society of Addition Medicine.
https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Obstetric-Practice/Opioid-Use-and-Opioid-Use-Disorder-in-Pregnancy

Pregnancy- and Child-Related Legal and Policy Issues Concerning Justice-Involved Women (2013). National Institute of Corrections.
http://nicic.gov/library/027701


Case 3:24-cv-00954 Document 1-1 Filed 08/06/24 Page 8 of 9 PageID #: 40

Proper Handling and Storage of Human Milk (2010). Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion. http://www.cdc.gov/breastfeeding/recommendations/handling_breastmilk.htm

Recommendations for Use of Antiretroviral Drugs in Pregnant HIV-1-Infected Women for Maternal Health and Interventions to Reduce Perinatal HIV Transmission in the United States (2014). HHS Panel on Treatment of HIV-Infected Pregnant Women and Prevention of Perinatal Transmission. http://aidsinfo.nih.gov/contentfiles/lvguidelines/perinatalgl.pdf

Restraint of Pregnant Inmates (Position Statement) (2010; reaffirmed 2015). National Commission on Correctional Health Care. http://www.ncchc.org/restraint-of-pregnant-inmates

Revised Recommendations for HIV Testing of Adults, Adolescents, and Pregnant Women in Health-Care Settings (2006). Branson, B. M., et al. *Morbidity and Mortality Weekly Report*, 55(RR14), 1-17. http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5514a1.htm

SafeFetus (online database of medications). http:/www.safefetus.com

Screening and Diagnosis of Gestational Diabetes Mellitus. American Association of Clinical Endocrinologists, American College of Obstetricians and Gynecologists, and American Diabetes Association. Available at the National Guideline Clearinghouse. http://www.guideline.gov/syntheses/synthesis.aspx?id=48531&search=gestational+diabetes

Screening for Perinatal Depression (2015; reaffirmed 2016). American College of Obstetricians and Gynecologists Committee on Obstetric Practice. https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Obstetric-Practice/Screening-for-Perinatal-Depression

Solitary Confinement (Isolation) (Position Statement) (2016). National Commission on Correctional Health Care. http://www.ncchc.org/solitary-confinement

Update on Immunization and Pregnancy: Tetanus, Diphtheria, and Pertussis Vaccination (2017). American College of Obstetricians and Gynecologists Committee on Obstetric Practice. http://www.acog.org/Resources_And_Publications/Committee_Opinions/Committee_on_Obstetric_Practice/Update_on_Immunization_and_Pregnancy_Tetanus_Diphtheria_and_Pertussis_Vaccination

U.S. Medical Eligibility Criteria for Contraceptive Use (2016). Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion. https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6503.pdf

Weight Gain During Pregnancy (2013). American College of Obstetricians and Gynecologists Committee on Obstetric Practice. http://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Obstetric-Practice/Weight-Gain-During-Pregnancy

Weight Gain During Pregnancy: Reexamining the Guidelines (2009). Institutes of Medicine of the National Academies. http://iom.edu/Reports/2009/Weight-Gain-During-Pregnancy-Reexamining-the-Guidelines.aspx


Case 3:24-cv-00954 Document 1-1 Filed 08/06/24 Page 9 of 9 PageID #: 41