National Commission on Correctional Health Care

1145 W. Diversey Pkwy. 773-880-1460
Chicago, Illinois 60614 www.ncchc.org

# POSITION STATEMENT

## Solitary Confinement (Isolation)

**Definition**

Solitary confinement is the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals. Those in solitary confinement often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs. Different jurisdictions refer to solitary confinement by a variety of terms, such as isolation; administrative, protective, or disciplinary segregation; permanent lockdown; maximum security; supermax; security housing; special housing; intensive management; and restrictive housing units. Regardless of the term used, an individual who is deprived of meaningful contact with others is considered to be in solitary confinement.

### Introduction

In recent years, there has been increasing controversy over the use of solitary confinement in the nations' jails, prisons, and juvenile detention centers. Many national and international organizations have recognized prolonged solitary confinement as cruel, inhumane, and degrading treatment, and harmful to an individual's health. In its position statement on Correctional Health Professionals' Response to Inmate Abuse, NCCHC declares:

1. Correctional health professionals' duty is to the clinical care, physical safety, and psychological wellness of their patients.
2. Correctional health professionals should not condone or participate in cruel, inhumane, or degrading treatment of inmates.

This position statement has been developed to assist health care professionals in addressing the use of solitary confinement in the facilities in which they work.

### Background

Over the last 25 to 30 years, there has been a marked increase in the use of solitary confinement in the United States. A report based on Bureau of Justice Statistics data estimated that approximately 80,000 inmates are held in some form of isolation in state and federal prisons on any given day.[1] Isolation can last for periods of time ranging from days to years, even decades. It can occur in "supermax" prisons and in special housing units within jails and prisons.

Adults and juveniles can be placed in solitary confinement for a variety of reasons, including (1) punishment for not following rules (sometimes as minor as failure to obey an order or talking back); (2) concerns related to the safety of staff or other inmates, such as the management of known or suspected gang members; (3) their own protection (such as for sex offenders or individuals who are transgender or sexually vulnerable); and (4) clinical or therapeutic reasons. In many cases, individuals with mental health problems who have difficulty conforming to facility rules, but are not violent or dangerous, end up being housed in these units. Continued misconduct related to their underlying mental health issues, which is often exacerbated by their isolation, can result in their being held in solitary confinement indefinitely.

It is well established that persons with mental illness are particularly vulnerable to the harms of solitary confinement. As a result, federal courts have repeatedly found the solitary confinement of the mentally ill to be unconstitutional[2], and in 2012, the American Psychiatric Association adopted a policy opposing the "prolonged" segregation of prisoners with serious mental illness, which it defined as longer than 3 to 4 weeks.[3]

The inherent restriction in meaningful social interaction and environmental stimulation and the lack of control adversely impact the health and welfare of all who are held in solitary confinement.[4,5,6,7,8] While there is a school of thought that suggests that solitary confinement in facilities that meet basic standards of humane care has relatively little adverse effect on most individuals' mental or physical health[9,10], this is not the view of most international organizations. The World Health Organization (WHO), United Nations, and other international bodies have recognized that solitary confinement is harmful to health. The WHO notes that effects can include gastrointestinal and genitourinary problems, diaphoresis, insomnia, deterioration of eyesight, profound fatigue, heart palpitations, migraines, back and joint pains, weight loss, diarrhea, and aggravation of preexisting medical problems.[11] Even those without a prior history of mental illness may experience a deterioration in mental health, experiencing anxiety, depression, anger, diminished impulse control, paranoia, visual and auditory hallucinations, cognitive disturbances, obsessive thoughts, paranoia, hypersensitivity to stimuli, posttraumatic stress disorder, self-harm, suicide, and/or psychosis. Some of these effects may persist after release from solitary confinement. Moreover, the very nature of prolonged social isolation is antithetical to the goals of rehabilitation and social integration.

These consequences are especially harmful to juveniles whose brains are still developing and those with mental health problems. In 2012, a task force appointed by the U.S. attorney general concluded:

> Nowhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement.... Juveniles experience symptoms of paranoia, anxiety, and depression even after very short periods of isolation. Confined youth who spend extended periods isolated are among the most likely to attempt or actually commit suicide. One national study found that among the suicides in juvenile facilities, half of the victims were in isolation at the time they took their own lives, and 62 percent of victims had a history of solitary confinement.[12]

Psychologically, children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting. They experience time differently—a day for a child feels longer than a day to an adult—and have a greater need for social stimulation.[13,14,15,16] The American Academy of Child and Adolescent Psychiatry has concluded that, due to their "developmental vulnerability," adolescents are in particular danger of adverse reactions to prolonged isolation and solitary confinement.[17]

In a report to the United Nations Human Rights Committee, Juan Méndez, U.N. special rapporteur on torture and cruel, inhuman, and degrading treatment, concludes that juveniles, given their physical and mental immaturity, should never be subjected to solitary confinement. He states that the imposition of solitary confinement of any duration on juveniles is cruel, inhuman, and degrading treatment and violates both the International Covenant on Civil and Political Rights and the Convention against Torture. He asserts, "given their diminished mental capacity and that solitary confinement often results in severe exacerbation of a previously existing mental condition," the imposition of solitary confinement, of any duration, on persons with mental disabilities is cruel, inhuman, or degrading treatment and also violates the Covenant and the Convention.[18]

The United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules) state that solitary confinement should be prohibited in cases involving children and in the case of adults with mental or physical disabilities when their conditions would be exacerbated by such measures.[19]

International standards established by the United Nations Rules for the Treatment of Women Prisoners and Non-Custodial Measures for Women Offenders state that pregnant women should never be placed in solitary confinement as they are especially susceptible to its harmful psychological effects.[20] In addition, placing these women in isolation impedes their access to necessary and timely prenatal care.[21]

The U.N. special rapporteur further asserts that solitary confinement is a harsh measure that may cause serious psychological and physiological adverse effects on individuals regardless of their specific conditions. He finds solitary confinement to be contrary to one of the essential aims of the penitentiary


Case 3:24-cv-00954 Document 1-2 Filed 08/06/24 Page 2 of 6 PageID #: 43

system, which is to rehabilitate offenders and facilitate their reintegration into society. He recommends a complete ban on prolonged or indefinite solitary confinement, citing 15 days as the starting point of prolonged solitary confinement because, after that, "some of the harmful psychological effects of isolation can become irreversible."[22] The Mandela Rules affirm that solitary confinement "shall be used only in exceptional cases as a last resort, for as short a time as possible and subject to independent review…." They specifically prohibit indefinite and/or prolonged (defined as a time period in excess of 15 consecutive days) solitary confinement, or placement in a dark or constantly lit cell, noting that these conditions amount to "torture or other cruel, inhuman or degrading treatment or punishment."[23]

By virtue of working in facilities where security and control, rather than the health and well-being of their patients, are the priorities, health professionals working in correctional facilities are often faced with ethical dilemmas. The participation of health care staff in actions that may be injurious to an individual's health is in conflict with their role as caregivers. This is especially true when they are called on to determine whether a patient is physically and psychologically well enough to be placed in solitary confinement. By doing so, health care providers become participants in the process of solitary confinement. Both the United Nations and the WHO are opposed to such involvement on ethical grounds. The U.N. has stated that it is a contravention of medical ethics for health care staff, particularly physicians:

> To certify, or to participate in the certification of, the fitness of prisoners or detainees for any form of treatment or punishment that may adversely affect their physical or mental health and which is not in accordance with the relevant international instruments, or to participate in any way in the infliction of any such treatment or punishment which is not in accordance with the relevant international instruments.[24]

The WHO states health care staff should never participate in enforcing any sanctions or in the underlying decision-making process, as this is not a medical act, and:

> Doctors may frequently be approached when the sanction considered is solitary confinement. Solitary confinement has clearly been shown to be injurious to health. In cases where it is still enforced, its use should be limited to the shortest time possible. Thus, doctors should not collude in moves to segregate or restrict the movement of prisoners except on purely medical grounds, and they should not certify a prisoner as being fit for disciplinary isolation or any other form of punishment. Prisoners who are placed in isolation should be evaluated initially and periodically for acute mental illness, drug or alcohol withdrawal and injuries. If these are identified, prisoners should have access to prompt and effective treatment. Doctors should not certify fitness for isolation.[25]

At the same time, health care staff must ensure that those in solitary confinement have access to and receive needed clinical care. As stated in the European Prison Rules (2006):

> Medical practitioners or qualified nurses should not be obliged to pronounce prisoners fit for punishment but may advise prison authorities of the risks that certain measures may pose to the health of prisoners. They would have a particular duty to prisoners who are held in conditions of solitary confinement for whatever reason: for disciplinary purposes; as a result of their "dangerousness" or their "troublesome" behaviour; in the interests of a criminal investigation; at their own request. Following established practice, (see for example Rule 32.3 of the UN Standard Minimum Rules for the Treatment of Prisoners) such prisoners should be visited daily. Such visits can in no way be considered as condoning or legitimising a decision to put or to keep a prisoner in solitary confinement. Moreover, medical practitioners or qualified nurses should respond promptly to request for treatment by prisoners held in such conditions or by prison staff….[26]

The WHO also states:

> Once a sanction is enforced, doctors must follow the prisoner being punished with extreme vigilance. It is well-established that solitary confinement constitutes an important stressor and risk, notably of suicide. Doctors must pay particular attention to such prisoners and visit them


Case 3:24-cv-00954 Document 1-2 Filed 08/06/24 Page 3 of 6 PageID #: 44

regularly of their own initiative, as soon as possible after an isolation order has taken effect and daily thereafter, to assess their physical and mental state and determine any deterioration in their well-being. Furthermore, doctors must immediately inform the prison management if a prisoner presents a health problem.[27]

While correctional health care providers often encounter obstacles in the performance of their duties, there are specific challenges to the provision of health care to individuals in solitary confinement. Solitary confinement often makes it more difficult for patients to access care. Many facilities require that individuals in solitary confinement be shackled and accompanied by two officers when they are out of their cells. Many times, they must be body searched upon leaving and returning to their cells. As a result, health care staff may decide to perform their evaluations at cell-front, through bars or slots in the doors, either for their own or the patient's ease. Alternatively, clinical encounters may occur with the patient in a metal cage or behind a glass partition. Even when patients are taken to the medical clinic for evaluation, they often remain in restraints with custody officers in close proximity. Such arrangements are not respectful of an individual's dignity, interfere with privacy and confidentiality, and hamper or prevent the clinician from performing an adequate evaluation.

**Position Statement**

The following principles are to guide correctional health professionals in addressing issues about solitary confinement.

1. Prolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health.

2. Juveniles[28], mentally ill individuals, and pregnant women should be excluded from solitary confinement of any duration.

3. Correctional health professionals should not condone or participate in cruel, inhumane, or degrading treatment of adults or juveniles in custody.

4. Prolonged solitary confinement should be eliminated as a means of punishment.

5. Solitary confinement as an administrative method of maintaining security should be used only as an exceptional measure when other, less restrictive options are not available, and then for the shortest time possible. Solitary confinement should never exceed 15 days. In those rare cases where longer isolation is required to protect the safety of staff and/or other inmates, more humane conditions of confinement need to be utilized.

6. Correctional health professionals' duty is the clinical care, physical safety, and psychological wellness of their patients.

7. Isolation for clinical or therapeutic purposes should be allowed only upon the order of a health care professional and for the shortest duration and under the least restrictive conditions possible, and should take place in a clinically designated and supervised area.

8. Individuals who are separated from the general population for their own protection should be housed in the least restrictive conditions possible.

9. Health staff must not be involved in determining whether adults or juveniles are physically or psychologically able to be placed in isolation.

10. Individuals in solitary confinement, like other inmates, are entitled to health care that is consistent with the community standard of care.

11. Health care staff should evaluate individuals in solitary confinement upon placement and thereafter, on at least a daily basis. They should provide them with prompt medical assistance and treatment as required.

12. Health care staff must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided.

13. Principles of respect and medical confidentiality must be observed for patients who are in solitary confinement. Medical examinations should occur in clinical areas where privacy can be ensured. Patients should be examined without restraints and without the presence of custody staff unless there is a high risk of violence. In situations where this cannot occur, the patient's privacy, dignity, and confidentiality should be maintained as much as possible. If custody staff must be present, they should maintain visual contact, but remain at a distance that provides auditory privacy.

14. Health care staff should ensure that the hygiene and cleanliness of individuals in solitary confinement and their housing areas are maintained; that they are receiving sufficient food, water, clothing, and exercise; and that the heating, lighting, and ventilation are adequate.

15. Adults and juveniles in solitary confinement should have as much human contact as possible with people from outside the facility and with custodial, educational, religious, and medical staff.

16. Appropriate programs need to be available to individuals in confinement to assist them with the transition to other housing units or the community, if released from isolation to the community.

17. In systems that do not conform to international standards, health care staff should advocate with correctional officials to establish policies prohibiting the use of solitary confinement for juveniles and mentally ill individuals, and limiting its use to less than 15 days for all others.

***Adopted by the National Commission on Correctional Health Care Board of Directors***
***April 10, 2016***

**Notes**


1. Shames, A., Wilcox, J., & Subramanian, R. (May 2015). Solitary confinement: Common misconceptions and emerging safe alternatives. Vera Institute of Justice.
2. See, e.g., Madrid, 889 F. Supp. at 1265-66; Ruiz v. Johnson, 37 F.Supp.2d 855, 915 (S.D. Tex. 1999), 243 F.3d 941 (5th Cir. 2001), adhered to on remand, 154 F.Supp.2d 975 (S.D. Tex. 2001).
3. American Psychiatric Association. (December 2012). Position statement on segregation of prisoners with mental illness.
4. Scharff Smith, P. (2006). The effects of solitary confinement on prison inmates: A brief history and review of the literature*. Crime and Justice, 34*(1), 441-528.
5. Haney, C. (January 2003). Mental health issues in long-term solitary and "supermax" confinement, *Crime & Delinquency, (49)*1, 124-156.
6. Grassian, S. (1983). Psychopathological effects of solitary confinement*. American Journal of Psychiatry, 140,* 1450-1454.
7. Grassian, S. (2006). Psychiatric effects of solitary confinement. *Washington University Journal of Law & Policy, 22,* 325-383.
8. Kaba, F., et al. (2014). Solitary confinement and risk of self-harm among jail inmates. *American Journal of Public Health*, *104*(3), 442-447.
9. Clements, C. B., et al. (2007). Systematic issues and correctional outcomes: Expanding the scope of correctional psychology. *Criminal Justice and Behavior, 34,* 919-932.
10. Gendreau, P., & Goggin, C. (2014). Practicing psychology in correctional settings. In I. B. Weiner & R. K. Otto (Eds.), *The handbook of forensic psychology* (4th ed.). Hoboken, NJ: Wiley.

11. World Health Organization. (2014). Prisons and health (p. 28).
12. Department of Justice. (December 2012). Report of the Attorney General's National Task Force on Children Exposed to Violence.
13. Steinberg, L., et al. (2009). Age differences in future orientation and delay discounting. *Child Development, 80*, 28-44.
14. Woolard, J., Odgers, C., Lanza-Kaduce, L., & Daglis, H. (2005). Juveniles within adult correctional settings: Legal pathways and developmental considerations. *International Journal of Forensic Mental Health, 4*(1), 1-18.
15. Laible, D., Carlo, G., & Raffaelli, M. (2000). The differential relations of parent and peer attachment to adolescent adjustment, *Journal of Youth and Adolescence, 29*(1), 45-59.
16. Arredondo, D. E. (2004). Principles of child development and juvenile justice information for decision-makers*.* *Journal of the Center for Families, Children & the Courts*.
17. American Academy of Child & Adolescent Psychiatry. (April 2012). Solitary confinement of juvenile offenders (Policy Statement).
18. Méndez, J. (2011). Torture and other cruel, inhuman or degrading treatment or punishment. Interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment (p. 21).
19. United Nations. (May 2015). United Nations standard minimum rules for the treatment of prisoners (the Mandela Rules) (Rule 45).
20. United Nations. (2010). United Nations rules for the treatment of women prisoners and non-custodial measures for women offenders (the Bangkok rules).
21. ACLU Foundation. (2014). Worse than second-class: Solitary confinement of women in the United States.
22. United Nations. (May 2015). United Nations standard minimum rules for the treatment of prisoners (the Mandela Rules) (p. 13).
23. Op. cit. (Rules 43 & 44).
24. United Nations Office of the High Commissioner for Human Rights. (1982). Principles of medical ethics relevant to the role of health personnel, particularly physicians, in the protection of prisoners and detainees against torture and other cruel, inhuman or degrading treatment or punishment.
25. World Health Organization. (2007). Health in prisons: A WHO guide to the essentials in prison health (p. 36).
26. Council of Europe. (2006). Commentary to recommendation rec(2006) 2 of the Committee of Ministers to Member States on the European Prison Rules.
27. Op. cit., p. 13.
28. Stop Solitary for Kids. (2016). Stop Solitary for Kids (Position Statement).

**Additional Resources**

1. National Commission on Correctional Heath Care. (2012). Correctional health professionals' response to inmate abuse (Position Statement).
2. American Public Health Association. (November 2013). Solitary confinement as a public health issue (Policy Statement).
3. Shalev, S. (2008). Sourcebook on solitary confinement. London: Mannheim Centre for Criminology, London School of Economics.
4. Metzner, J. (2015). Mental health considerations for segregated inmates.


Case 3:24-cv-00954 Document 1-2 Filed 08/06/24 Page 6 of 6 PageID #: 47